UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

ATCHAFALAYA BASINKEEPER, INC., ET AL.

CIVIL ACTION

VERSUS

SCOTT A. SPELLMON, ET AL.

NO. 23-01697-BAJ-RLB

RULING AND ORDER

This case concerns an after-the-fact permit (a permit that is granted after construction has begun) issued by the U.S. Army Corps of Engineers and its officials ("Defendants" or "Corps") for a structure (the "Miller Structure") in Pat's Throat Bayou. Plaintiffs Atchafalaya Basinkeeper and Louisiana Crawfish Producers Association-West are nonprofit organizations alleging that the Corps violated the Clean Water Act ("CWA") and the Rivers and Harbors Act ("RHA") and acted arbitrarily, capriciously, and in excess of statutory authority when it issued the permit after-the-fact as a Nationwide Permit ("NWP") 14.

Now before the Court are Plaintiffs' **Motion For Summary Judgment (Doc. 30)** and the Federal Government Defendants' **Cross Motion For Summary Judgment (Doc. 33)**. The parties submitted supplemental briefing. (Docs. 35, 36). Plaintiffs seek relief in the form of a Court Order:

(1) Declaring the Corps' authorization of the Miller Structure to be illegal;

(2) Vacating/setting aside the Corps' NWP authorization #MVN-2021-01131-CF for the Miller Structure;

(3) Enjoining the application of NWP 14 or any other Army Corps Nationwide Permit to the structure;

(4) Declaring that the Corps' regulations allowing it to issue nationwide permits under the RHA exceeds the Corps' statutory authority, and vacating that regulation;

(5) Declaring that use of NWP 14 for after-the-fact authorizations is illegal under the RHA, and enjoining such uses in the Atchafalaya Basin.

The Court has carefully considered the Administrative Record, the arguments of all parties, and the applicable law and jurisprudence in this matter. For the following reasons, Plaintiffs' and Defendants' Motions will both be **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

Pat's Throat Bayou is located within the Atchafalaya Basin. (AR 10–12). Pat's Throat has long been used for access to fishing grounds (AR 87; AR 93), and it sustains the area's crawfish populations. (*See* AR 87–88, AR 93). Pat's Throat Bayou is also a historically navigable waterway falling under the Corps' jurisdiction. (*See* AR 90).

In September 2021, the Miller Hunting Club built a structure[1] (the "Miller Structure") across Pat's Throat to access additional hunting areas without first obtaining a permit from the Corps. (AR 84; AR 93; AR 90). The Miller Structure is approximately 32 feet long, 17 feet wide, and 6 feet tall, and has a few culverts so

---

[1] Plaintiffs refer to the structure as a "dam."

2

that flowing water can pass through it (AR 1; AR 13; AR 84; AR 75–78, AR 56–57). The Miller Structure spans across Pat's Throat Bayou, so boats cannot pass it. (*See* AR 75–78, AR 56–57, AR 13, Doc. 30-3 ¶ 20 Doc. 30-7 ¶ 12). Prior to the construction of the Miller Structure, fishermen would regularly clear away branches and trees that fell into Pat's Throat if the debris blocked boat access. (Doc. 30-3 ¶ 12).

In October 2021, Plaintiff Atchafalaya Basinkeeper sent the Corps a letter notifying it of the "illegal dam . . . across Pat's Throat . . . [which] completely stops all navigation through the bayou." (AR 93). The letter warned that the structure would reduce the water flow speed and "forever alter the hydrology of the area if allowed to remain into the high-water season." (AR 93–94). Plaintiff also attached photographs of the structure. (*Id.*).

Later that month, the Corps issued Benjamin Miller ("Miller") of the Miller Hunting Club a "Notice of Violation" for the "unauthorized work and fill material in section 10 waters" that created the structure. (AR 90). The Corps noted that the activity was a violation of both the RHA and the CWA. (*Id.*). Plaintiffs were not informed whether the Corps pursued any follow-up enforcement action, so Plaintiffs sent a Notice of Intent to File a Clean Water Act Suit Against Miller Hunting Club to Benjamin Miller in November 2021, copying the Corps on this notice. (AR 86–89). The November 2021 Notice alleged that Miller discharged fill into jurisdictional waters without a permit, in violation of the Clean Water Act. (AR 86–88). The notice also noted that although fishermen had used Pat's Throat for navigation for over a century, "navigation [was] now completely impounded" because of the structure. (*Id.*).

3

Miller proceeded to submit an after-the-fact permit application to the Corps in January 2022. (AR 83–85). The Corps also received several photographs that Miller took of the Miller Structure. (AR 14–17).

The Miller Structure required at least two types of legal permission from the Corps: (1) authorization under Section 404 of the Clean Water Act to discharge fill as a pollutant into navigable waters (33 U.S.C. §§ 1311(a); 1344; 1362(7); and (2) authorization under Section 10 of the Rivers and Harbors Act to obstruct navigable waters (33 U.S.C. § 403).

The Corps asked Miller whether others used the Pat's Throat for access, and Miller said "Pat[']s [T]hroat is cluttered with debris and fallen trees. So any boat travels could not happen," also sending a picture of debris and fallen trees in Pat's Throat (AR 51–55). This conflicted with Plaintiffs' communications with the Corps, which stated that fishermen were navigating through Pat's Throat. (AR 87; AR 93). Without conducting a site visit, in March 2022, the Corps granted the Miller Structure an after-the-fact permit under NWP 14 (AR 7–8), along with a Memorandum for Record (AR 1–6), that authorized the Miller Structure under Section 10 of the RHA and Section 404(b) of the CWA.

A month after the Corps authorized the Miller Structure, Corps employees sent emails to one another indicating that they did not know the bottom elevation of water at the Miller Structure, nor did they have information about the navigability of Pat's Throat besides the photograph of the debris Miller sent. One email said:

> *During low-water, how deep is the water in Pat's Throat at the culverts? And, do we know what the bottom elevation (NGVD) is at the culvert location? I'm*

curious to know at what gauge elevation does the water begin to backflow from Whiskey Pilot Channel into Pat's Throat and compare the elevations. This should shed some light on navigability, if Pat's Throat is not littered with obstructions (i.e., falling trees, logs, etc.). Also, go ahead and schedule a site visit soon so we can confirm the presence of the water control structure (WCS) and photographically document the navigability of Pat's Throat from the WCS to the culverts, basically is it passable by boat.

(Doc. 21-2 at 2 (emphasis added)). Another Corps employee responded to the email as follows:

When its low I think the water is a foot or two feet max based on the ATF drawings. Attached is a photo the Hunting Club provided me showing that debris is in the canal. The photo was provided when the Atchafalaya River was moving towards flood stage so it doesn't quite represent the lowest water level. The Hunting Club said that this debris is minor compared to larger debris areas in the canal so currently I believe that the waterway is currently impassable unless all of the debris would be removed. If all the debris would be removed then it MAYBE would be navigable during high waters for a few months a year. *We don't know the bottom elevation (NGVD) at the culvert location.*

(emphasis added) (*Id.* at 1).

The record does not reflect that the Corps visited the Miller Structure before or after authorizing the Permit. Plaintiffs brought this instant lawsuit in December 2023, alleging that the Miller Structure did not meet the General or Regional Conditions required for it to obtain an after-the-fact NWP 14. Plaintiffs also allege that the Corps' regulations authorizing it to issue after-the-fact permits and nationwide permits were unlawful.

## II.    LEGAL STANDARD

Section 10 of the Rivers and Harbors Act makes it is unlawful "to build or commence the building" of structures and other work in the navigable waters of the

5

United States without first obtaining authorization from the Corps. 33 U.S.C. § 403.

Section 404(b) of the Clean Water Act prohibits the discharge of dredged or fill material into waters of the United States ["WOTUS"] without similarly obtaining authorization from the Corps. 33 U.S.C. §§ 1311(a); 1344; 1362(7). Fill material is defined as material "placed in [WOTUS] where the material has the effect of: (i) [r]eplacing any portion of a [WOTUS] with dry land or (ii) [c]hanging the bottom elevation of any portion of a [WOTUS]." 33 C.F.R. §§ 323.2(c), 323.2(e)(1). The Corps issues authorizations for CWA Section 404(b) and RHA Section 10 permits under NWP 14 in one consolidated document, as it did here. 86 Fed. Reg. 2744 (Jan. 13, 2021).

The Corps issues permits for Section 404(b) of the CWA and Section 10 of the RHA as either individual permits or general permits.[2] General permits are issued to categories of projects that the Corps has determined cause only minimal adverse environmental effects. 33 U.S.C. §§ 1344(e)(1), 322.2(f). The CWA expressly empowers the Corps to adopt schemes to issue general permits, 33 U.S.C. § 1344, while the RHA does not.

Alternatively, the Corps issues individual permits to specific projects after reviewing the projects on an individual basis. 33 C.F.R. § 322.2(e). Individual permits are required when a project does not fall into any of the categories of projects covered by general permits. 33 C.F.R. § 322.3(a). If the Corps issues an individual permit, the Corps must provide public notice and the opportunity for public hearings before

---

[2] Nationwide permits, such as NWP 14, are general permits. 33 C.F.R. § 330.2(b).

issuing the permit. 33 U.S.C. § 1344(a). Additionally, the Corps may not issue an individual permit for an activity if there are less environmentally damaging practicable alternatives or where the activity contributes to significant degradation of WOTUS. 40 C.F.R. §§ 230.10(a), 230.10(c).

The Permit issued here granting CWA Section 404 authorization and RHA Section 10 authorization was NWP 14. NWP 14 requires that applicants seek verification from the Corps that their project complies with the NWP before beginning construction. 33 C.F.R. § 330.6(a). The Corps then reviews the project to ensure that it complies with the terms and conditions of the NWP. 33 C.F.R. § 330.1(e)(2).

NWP 14 authorizes structures such as roads, highways, and railways that cross WOTUS and which do not cause a loss of greater than half an acre of WOTUS. 86 Fed. Reg. 73522, 73538 (Dec. 27, 2021). In order to quality for NWP 14, the applicant must meet all General and Regional Conditions applicable to the NWP. General Conditions are imposed on all nationwide permits (86 Fed. Reg. 2744, 2758, 2867–75 (Jan. 13, 2021); 33 C.F.R. § 330.1(c)), and regional conditions are imposed on a regional basis onto nationwide permits (33 C.F.R. § 330.5(c)(1)).

The Corps can issue an NWP to an activity "only if that activity and the permittee satisfy all of the NWP's terms and conditions." 33 C.F.R. § 330.1(c). In other words, a "prospective permittee must satisfy all terms and conditions of an NWP for a valid authorization to occur." *Id.* § 330.4(a).

The conditions applicable to NWP 14 at issue here are General Conditions 1, 2, 5, and 9, and Regional Condition 7. (AR 18–46). Plaintiffs contend that the Corps'

7

authorization of the Miller Structure under NWP 14 was arbitrary and capricious because the structure did not meet these conditions.

General Condition 1 provides that the activity may not cause "more than a minimal adverse effect on navigation." (AR 19). General Condition 2 provides that the activity may not "substantially disrupt the necessary life cycle movements" of aquatic life indigenous to the waterbody and that all crossings shall be "suitably culverted, bridged, or otherwise designed and constructed to maintain low flows to sustain the movement of those aquatic species." (AR 19–20). General Condition 5 provides that an activity may not occur "in areas of concentrated shellfish populations[.]" (AR 20). General Condition 9 provides that "[t]he activity must be constructed to withstand expected high flows" and the activity may not "impede the passage of normal or high flows." *Id.* Regional Condition 7 provides that culverts "must be sufficiently sized to maintain expected high-water flows and be installed at a sufficient depth to maintain low flows to sustain the movement of aquatic species." (AR 37).

If an applicant constructs a project without obtaining required Corps authorization, the RHA authorizes the Corps to respond through legal action. 33 U.S.C. § 406. Under the Corps' regulations, the Corps can also respond by requiring initial corrective measures (33 C.F.R. § 326.3(d)), voluntary restoration (33 C.F.R. § 326.3(e)(1)(i)), or the submission of an after-the-fact permit application (33 C.F.R. § 326.3(e)), which is how the Corps responded to the Miller Structure. The Corps can issue an "after-the-fact" authorization when it determines that the work

does not contravene the public interest and complied with applicable guidelines. *See, e.g.*, 33 C.F.R. § 330.6(e); 39 Fed. Reg. 12115, 12123–24 (Apr. 3, 1974); 40 Fed. Reg. 31320, 31330–31 (July 25, 1975); 11 Fed. Reg. 117, 117A–826 (Sept. 11, 1946).

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge to an agency action under the Administrative Procedure Act (APA), "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). Thus, in evaluating a case on summary judgment, the court applies the standard of review from the APA. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001).

In a challenge to agency action brought pursuant to the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)–(D). When reviewing for arbitrariness and capriciousness, a court considers whether an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Agency action is arbitrary and capricious when "the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Id.* Instead, this court looks to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

The APA additionally requires courts to set aside agency action that exceeds statutory authority. 5 U.S.C.§ 706(2)(C). In determining whether an agency has acted within its statutory authority, courts "must exercise their independent judgment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

## IV.  ANALYSIS

This case concerns the Corps' issuance of NWP 14 to the Miller Structure. First, the Court finds that Plaintiffs have standing to challenge the issuance of NWP 14. The Court also finds that Plaintiffs have not waived their CWA claims. The Court will additionally admit Plaintiffs' extra-record testimonies. Second, the Court finds that the Corps reached unreasonable conclusions about General Conditions 5 and 9 and Regional Conditions 7. Because the Structure could only obtain NWP 14 if it adhered to these conditions, the Court will vacate the NWP 14 issued to the Miller Structure. Finally, the Court finds it inappropriate to vacate the Corps' regulations governing the issuance of after-the-fact permits and nationwide permits.

10

### A. Plaintiffs Have Standing.

For standing in federal proceedings, a party must demonstrate the "triad of injury in fact, causation, and redressability." *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103 (1998). The injury in fact must be "a harm suffered by the plaintiff that is 'concrete' and 'actual or imminent.'" *Id.* (citing *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990)). Causation requires a "traceable connection" between the plaintiff's injury and the defendant's conduct. *Id.* Redressability requires "a likelihood that the requested relief will redress the alleged injury." *Id.*

Plaintiffs Atchafalaya Basinkeeper and Louisiana Crawfish Producers' Association-West seek associational standing. Associational standing exists when at least one of the entity's "members would otherwise have standing to sue in their own right, the interests at stake are germane to the [entity's] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343, 97 (1977)).

When a case involves multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief." *Town of Chester v. Laroe Estates, Inc.,* 581 U.S. 433, 434 (2017). Because both organizations are seeking the same form of relief for each claim and associational standing, the Court can proceed to the merits if a single member of either Atchafalaya Basinkeeper or Louisiana Crawfish Producers' Association-West has standing.

Turning to whether Plaintiffs' members would have standing to sue in their

11

own right: first, Plaintiffs must demonstrate that a member has suffered an injury in fact to a "legally protected interest." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). At summary judgment, injury must be set forth by specific facts rather than by general allegations. *Id.* at 561.

The Court finds that Plaintiffs have adequately shown an injury in fact arising from the Corps' issuance of the Permit. Plaintiffs, commercial and recreational crawfish fishermen, testify that the Miller Structure has affected the quality of water in areas downstream from Pat's Throat, thereby decreasing the quantity and quality of the crawfish that they catch. (Docs. 30-3–30-7). Their income from their crawfish yields has decreased, and their costs have increased because they must travel further to access different fishing spots. One member of Louisiana Crawfish Producers' Association-West, Jody Meche, attested:

> While I continued to try crawfishing in Pat's Throat after the structure was built, its presence has significantly reduced available catch around Pat's Throat and Billy Littles Lake. . . . After 3 days, there were only 5-6 crawfish in each trap, instead of the 50-90 I would have expected to see. These crawfish did not look healthy, and were ugly, small, and discolored.
>
> [. . .]
>
> Because of the continued presence of the structure, crawfishing in Pat's Throat has not been profitable for me, and I have had to drive to other areas that were more productive, including Bayou Pigeon. It now takes me more than an hour longer to travel by truck, with my boat trailer, to get to the new area I have to launch from. This additional travel time cuts into the time that I can spend working.

(Doc. 30-3 ¶¶ 18, 21).

Another member of Louisiana Crawfish Producers' Association-West, Lon Theriot, Sr., attested that "[s]ince the dam's construction, no one, including

12

myself, is fishing in Ramah [where Billy Littles Lake is located] because Ramah has dead water" that "[c]rawfish are unable to thrive in." (Doc. 30-6 ¶ 7). Theriot further attested that he "usually make[s] around $1,000 per day when the crawfish are running in Ramah. However, because the crawfish cannot survive there due to the dam in Pat's Throat, I cannot fish in Ramah." (*Id.* ¶ 9). Additionally, while "it would only take [Theriot] thirty (30) minutes to travel to Ramah," but now he has an extra commute time of 1.5 hours to access a different fishing spot. (*Id.* ¶ 11). "This extra travel time has impacted the amount of time [Theriot has] been able to fish, as well as created added fuel cost. . . ." (*Id.* ¶ 12).

Economic harm, such as that at issue here, has been recognized to establish standing. *See, e.g., Sierra Club v. Morton*, 405 U.S. 727, 738 (1972). Defendants argue that Plaintiffs only speculate that the Miller Structure is adversely affecting crawfish in the area and decreasing their income, but the United States Court of Appeals for the Fifth Circuit has held that mere "concern" or "belief" that an action causes harm is sufficient to establish an injury in fact. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 556 (5th Cir. 1996).

Members also testify that the Miller Structure blocked a navigable waterway, and that this has harmed them personally. For example, one crawfisherman testified that the Miller Structure made Pat's Throat unnavigable, so he had to trailer his boat and drive to a distant boat launch to access his fishing spot, incurring additional commute-related expenses. (Doc. 30-3 ¶ 22). Another crawfisherman testified that he used to pass through Pat's Throat nearly every day during high water season, first as

13

a full-time commercial crawfisherman and now as a recreational fisherman, but the Miller Structure has blocked boat access through Pat's Throat, making it more difficult for him to recreationally fish and taking away his access to navigable waters. (Doc. 30-7 ¶¶ 3, 8, 11, 12). *See Sierra Club v. Morton*, 405 U.S. at 738 (protected interested may reflect aesthetic, conservational, and recreational, and economic values); *see also Silver Springs Paradise Co. v. Ray*, 50 F.2d 356, 359 (5th Cir. 1931) (The "public right of navigation entitles the public generally to the reasonable use of navigable waters."); La Civ. Code arts. 450, 452 ("[R]unning waters [and] the waters and bottoms of natural navigable water bodies" are "public things," which are "subject to public use in accordance with applicable laws and regulations."). The Declarations provided by Plaintiffs establish that Plaintiffs' members have the requisite injury in fact to proceed with the standing analysis.

Second, Plaintiffs' members must show traceability between the Corps' authorization of the Miller Structure and their injury. Harm is fairly traceable when there is a causal connection between the defendant's conduct and the alleged injury. *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 937 F.3d 533, 542–43 (5th Cir. 2019). The Court finds that the traceability requirement has been satisfied because, as Plaintiffs explain, when the Corps issued the Permit, it legalized the structure and allowed it to remain in Pat's Throat. If the Corps did not authorize the Miller Structure, the Corps could have required that the structure be removed and that the area be restored to pre-project conditions. (AR 90).

Third, individual members must show that their injury will be redressable by

14

a favorable Court decision setting aside the Permit authorization. If the Court deems that the Miller Structure did not satisfy NWP 14's general and regional conditions, this means that the Structure could only be authorized by an individual permit, not a general one. An individual permit would impose greater procedural requirements on the Corps and open up the possibility that the Corps may conclude that the Miller Structure violates RHA Section 10 and CWA Section 404. This is sufficient to establish redressability. *Ondrusek v. U.S. Army Corps of Eng'rs*, 123 F.4th 720, 734 (5th Cir. 2024) ("The injury is redressable by judicial review as long as there is some prospect that fixing the alleged procedural violation could cause the agency to change its position on the substantive action.") (internal quotations omitted); *see also id.* at 735 (preparation of a new decision "may at least force the Government to reconsider its decision, which satisfies the redressability element."); *Id.* ("It is enough for a plaintiff to show that there is a possibility that the procedural remedy will redress his injury") (internal quotations omitted). Therefore, members of the Plaintiffs have standing to sue in their own right.

Plaintiffs also meet the requirements of associational standing because at least one of the group's members would otherwise have standing to sue in their own right, as discussed, the interests at stake are germane to the organizations' purposes, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. Louisiana Crawfish Producer's Association-West's members have demonstrated in the Declarations quoted above that they have standing to sue in their own right. The interests at stake are germane to Louisiana

15

Crawfish Producer's Association-West's purpose, which is to protect the economic, environmental, and cultural interests of the Atchafalaya Basin and its residents, to promote a healthy habitat for crawfish, fish, and other wildlife that the Basin supports, and to protect and ensure public access to waters of the United States located in the Basin. (Doc. 30-5 ¶ 4). Nor do the claims asserted or relief requested here require the participation of the organization's individual members. *See Gulf Restoration Network v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012) ("Because neither the claims nor the relief require individualized proof, they are thus properly resolved in a group context" (quotations omitted, cleaned up)). For these reasons, Louisiana Crawfish Producer's Association-West has associational standing, and because Louisiana Crawfish Producer's Association-West and Atchafalaya Basinkeeper seek the same relief, the Court can proceed to the merits.

## B. Plaintiffs Have Not Waived Their CWA Claims.

The parties disagree about the type of relief the Court should grant if it finds that the Miller Structure did not meet all of NWP 14's conditions. As mentioned, the Corps issues RHA Section 10 and CWA Section 404(b) authorization under one NWP 14 document. 33 C.F.R. § 330.1(g) ("NWPs can be issued to satisfy the permit requirements of [the RHA] [and] section 404 of the Clean Water Act.").

The Corps asserts that the Court should only vacate the part of NWP 14 that applies to RHA authorization, and that the CWA authorization should remain unaffected, because Plaintiffs have waived their right to assert a CWA claim. The Corps contends that Plaintiffs only made passing, conclusory references to CWA violations in their motion for summary judgment, and that Plaintiffs do not have the

16

right to assert a CWA in their reply to their motion for summary judgment because "arguments raised for the first time in reply are generally forfeited." *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 754 (5th Cir. 2023).

Plaintiffs respond that they have not waived their right to assert a CWA claim. Plaintiffs contend that their claim that the Corps should not have issued NWP 14 to the Miller Structure does not break down into separate CWA and RHA arguments because NWP 14 grants authorization under both statutes. Plaintiffs argue that they sufficiently asserted CWA claims in their motion for summary judgment. Plaintiffs also assert that their Complaint put the Corps on clear notice of their CWA claims. Furthermore, Plaintiffs contend that even if the Court finds that Plaintiffs did not assert CWA claims in their motion for summary judgment, *Guillot on behalf of T.A.G.* is inapplicable because they asserted CWA claims in their memorandum in opposition to the Corps' Cross Motion for Summary Judgment, which was not a "reply."

The Court finds that Plaintiffs did not waive their CWA claims. NWP 14 authorizes both CWA and RHA activities under one general Permit Verification. (AR 7–AR 46). Plaintiffs repeatedly assert throughout their motion for summary judgment that the Corps violated the CWA by using NWP 14 to authorize the Miller Structure. (Doc. 30 at 1–2 ("The Corps violated the Clean Water Act and Rivers and Harbors Act by [] arbitrarily and capriciously using NWP 14 to authorize the dam even though the dam patently did not satisfy multiple conditions essential for coverage under NWP 14"); Doc. 30-1 at 8 (Defendants "violated the Clean Water Act and Rivers and Harbors Act when they issued Benjamin Miller an after-the-fact

17

approval of his illegal construction of a dam . . . pursuant to [NWP] 14"); *Id.* at 10 ("[T]he Corps' after-the-fact approval of the Miller Dam under NWP 14 . . . was arbitrary and capricious and illegal under the RHA and the Clean Water Act"); *Id.* at 48 ("[T]he Corps' issuance of after-the-fact permit [] to Benjamin Miller for the dam in Pat's Throat violates the Clean Water Act and Rivers and Harbors Act")). Plaintiffs also sufficiently explain that NWP 14 authorizes CWA activities and that their challenges apply to the entirety of NWP 14, including the CWA authorization embedded within NWP 14. Plaintiffs' motion for summary judgment makes clear that the Plaintiffs challenged the CWA authorizations within Miller's NWP 14. Therefore, the Corps will vacate the entirety of NWP 14, not just the RHA Section 10 authorization embedded within it.

## C. The Court Will Admit the Testimonies as Extra-Record Evidence.

Having found that Plaintiffs have met standing requirements, the Court will now turn to the issue of extra-record evidence. Plaintiffs ask the Court to admit the testimonies in their Declarations as extra-record evidence.

The APA requires a court reviewing an agency action to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Pursuant to this "record rule," "[a]gency action is to be upheld, if at all, on the basis of the record before the agency at the time it made its decision." *Indep. Turtle Farmers of La., Inc. v. United States*, 703 F. Supp. 2d 604, 610 (W.D. La. 2010)

18

(quoting *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988)). However, an agency cannot "unilaterally determine what constitutes the administrative record," and its "designation of the administrative record, like any established administrative procedure, is entitled only to a presumption of administrative regularity." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 18-23, 2019 WL 13159731, at *1 (M.D. La. May 14, 2019) (quoting *City of Dall., Tex. v. Hall*, No. 07-0060, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007)).

"The Court may look outside the administrative record in narrow circumstances." *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, No. 20-1367, 2021 WL 5769468, at *2 (E.D. La. Dec. 6, 2021). "Supplementation of the administrative record is not allowed unless the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency.'" *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (quoting *Am. Wildlands v. Kepmthorne*, 530 F. 3d 991, 1002 (D.C. Cir. 2008)). The introduction of "extra-record evidence" into the administrative record indicates the inclusion of "additional evidence 'outside of or in addition to the administrative record that was not necessarily considered before the agency.'" *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-126, 2015 WL 1883522, at *1 (S.D. Tex. Apr. 20, 2015) (citing *Calloway v. Harvey*, 590 F. Supp. 2d 29, 38 (D.D.C. 2008)). The Fifth Circuit has specifically held that supplementation with extra-record evidence "may be permitted" if the "the district court need[s] to

19

supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors. . . ." *Medina*, 602 F.3d 706 (cleaned up) (citations omitted).

Plaintiffs argue that the testimonies in their Declarations provide background information about the navigability of Pat's Throat, its regular use in commerce, and the effects of the Miller Structure on nearby water levels and the aquatic ecosystem that will shed light on whether the agency considered all relevant factors. Plaintiffs assert that the record is "obtuse" in this regard because the Corps did not conduct notice and comment prior to issuing the Permit, and therefore Plaintiffs did not have the opportunity to describe their use of the Pat's Throat or the Structure's effects on the waterway. In opposition, the Corps argues that the testimonies in the Declarations are not relevant to determining whether the agency reasonably explained its decision, and that the attempt to introduce the testimonies as extra-record evidence is untimely because it comes after the deadline to supplement the record.

Having considered the parties' arguments and the record as a whole, the Court finds it appropriate to consider the testimonies as extra-record evidence because they provide important "background information" that the record lacks. Specifically, the testimonies contain information about the conditions of Pat's Throat and the Miller Structure's impact prior to the Corps' authorization of the structure. The testimonies are relevant to determining whether the Corps considered the general and regional conditions at issue here at the time it issued the permit.

20

### D. The Authorization Violated General and Regional Conditions.

Plaintiffs ask the Court to set aside and declare unlawful the Corps' authorization of the Miller Structure. The Miller Structure was required to meet all the terms and conditions of NWP 14 in order to obtain authorization under it. 33 C.F.R. §330.4(a). Plaintiffs allege that the Miller Structure fails to satisfy the following conditions: (1) a project may not have more than a minimal adverse effect on navigation (General Condition 1); (2) the project must be "constructed to withstand expected high flows" and must not "impede the passage of normal or high flows" (General Condition 9); (3) the project must have culverts "sufficiently sized to maintain expected high-water flows and be installed at a sufficient depth to maintain low flows to sustain the movement of aquatic species" (Regional Condition 1); and (4) the project may not "occur in areas of concentrated shellfish populations" (General Condition 5).

### 1. The Court Will Not Determine Whether the Corps Reasonably Concluded that the Structure Did Not Violate General Condition 1.

Plaintiffs contend that the structure violated General Condition 1, which requires that "[n]o activity may cause more than a minimal adverse effect on navigation." (AR 19). There is no dispute that Pat's Throat Bayou is a navigable water of the United States. (AR 60; SAR 5). Fishermen have long passed through Pat's Throat Bayou to access nearby fishing areas. (Doc. 30-3 ¶ 12 ("The area around Pat's Throat has historically been good to fish because it is a migration route for fish."); Doc. 30-7 ¶ 3 ("My family and I have depended on Pat's Throat for crawfishing to make a living for my entire life."); Doc. 30-6 ¶ 13 ("I've been fishing in the

21

[Pat's Throat] area for almost my entire life.")). Now, the Miller Structure prevents direct access via Pat's Throat from the Atchafalaya River to these nearby fishing grounds. (AR 75–78; AR 55–57).

Prior to the Corps' authorization of the Miller Structure, Plaintiffs twice notified the Corps that Pat's Throat's was important to navigation and that the Miller Structure impeded navigation. (AR 93; AR 87). The photographs of the Miller Structure received by the Corps showed that it was impossible for boats to pass through Pat's Throat near the Atchafalaya River. (AR 55–57; AR 75–78; AR 93–94). Also before the Corps was Miller's photograph of debris in the waterway and his assurance that boats could not pass through the waterway. (AR 51–55).

In its authorization, the Corps cited Miller's statement for its conclusion that the Miller Structure would not affect navigation. (AR 1) ("[T]he permittee provided information that debris is common throughout the waterway and that the waterway is not navigable so the project will not have an effect on navigability.")).

According to Plaintiffs, the Corps acted arbitrarily and capriciously because it did not consider the letters Plaintiffs had submitted to the Corps indicating that the Miller Structure prevented navigation. Plaintiffs further contend that if the Corps considered Plaintiffs' letters, then the Corps acted arbitrarily and capriciously by offering an explanation for its decision that ran counter to the evidence before it. *Id.*; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Corps responds by citing a regulation used to assess navigability under the RHA. The Corps claims that under the regulation, a waterway may still be navigable even if an individual traveling by boat must carry his boat in certain areas (which individuals moving through Pat's Bayou would have to do, as boats cannot pass the Miller Structure):

> A stream may be navigable despite the existence of falls, rapids, sand bars, bridges, portages, shifting currents, or similar obstructions. Thus, a waterway in its original condition might have had substantial obstructions which were overcome by frontier boats and/or portages, and nevertheless be a "channel" of commerce, even though boats had to be removed from the water in some stretches, or logs be brought around an obstruction by means of artificial chutes.

33 C.F.R. § 329.10. The Corps also states that Pat's Throat is not the only path to nearby fishing areas, such as Billy Littles Lake, and that Plaintiffs' members can still travel to the Lake through alternative routes. The Corps further argues that it was not required to complete a site visit to verify Miller's assurance that Pat's Throat is not navigable because Miller's photographs of the structure provided the Corps with sufficient information to issue the verification. The Corps concludes that its decision was reasonable, citing *Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998) ("If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld.")).

Plaintiffs respond that the regulation cited by the Corps defining "navigability," 33 C.F.R. Part 329, is inapplicable because its purpose is to "define[] the term 'navigable waters of the United States' as it is used to define authorities of the Corps of Engineers." 33 C.F.R. § 329.1. In other words, Plaintiffs argue that the

23

regulation set the jurisdiction of the Corps to regulate activities, and is irrelevant to answer the question of whether the structure has more than a minimal adverse effect on "navigation."

The Corps responds that under its understanding of navigability, as informed by 33 C.F.R § 329.10, it considered the Miller Structure to have only a minimal impact on navigation. While the Miller Structure may have made it difficult to navigate down Pat's Throat, there were other pathways that individuals could take to get to Billy Littles Lake and other fishing areas.

The Court finds this to be a close call. Although the Miller Structure blocks access to Pat's Throat from the Atchafalaya River, boats can ultimately still reach their destination through alternate paths, however inconvenient. Under the regulation relied upon by the Corps, it appears that Pat's Throat could potentially still be considered navigable. Conversely, the Corps' cited regulation only states that Pat's Throat 'may' be considered navigable, without certainty ("A stream *may* be navigable despite the existence of . . . obstructions"). 33 C.F.R. § 329.10 (emphasis added). Additionally, the Corps had information before it, which it failed to respond to, indicating that fishermen regularly traversed through Pat's Throat prior to the construction of the Miller Structure. Accordingly, because the Court finds that the Corps reached unreasonable conclusions regarding the conditions discussed below, the Court need not conclusively decide this issue at this time.

### 2. The Corps Unreasonably Concluded that the Miller Structure Did Not Violate General Condition 9 and Regional Condition 7.

Plaintiffs contend that the Miller Structure did not meet the requirements of

24

General Condition 9 and Regional Condition 7. General Condition 9 provides that "[t]he activity must be constructed to withstand expected high flows" and prohibits any activity from restricting or impeding the normal flow of water. (AR 20). Regional Condition 7 requires that culverts "must be sufficiently sized to maintain expected high-water flows and be installed at a sufficient depth to maintain low flows to sustain the movement of aquatic species." (AR 37).

One month after the Corps issued the authorization, its employees exchanged emails indicating they lacked information about the bottom depth of water at the Miller Structure. (Doc. 21-2 at 1–2 ("We don't know the bottom elevation (NGVD) at the culvert location.")). The Corps' authorization does not discuss the depth of the culverts, and it does not discuss any specific consideration of water flow through the culverts. (AR 1–6). Plaintiffs' complaint that the Miller Structure affected water flow in the area was also in the administrative record. (AR 88 ("The impoundment at Pat's Throat will . . . reduce water flow. . . .")). The administrative record also contained Miller's photographs of the Miller Structure (AR 75–78; AR 56–57) and Miller's drawing of the Miller Structure, which did not show the low water mark or the bottom elevation (AR 13).

Plaintiffs argue that the Corps' authorization was arbitrary and capricious because the Corps failed to consider whether Miller Structure's culverts allowed water through in a way that would not violate General Condition 9 or Regional Condition 7.

The Corps responds that the photographs that Miller submitted confirmed that

25

water flows through the culverts and that the Corps reasonably concluded this was sufficient to ensure that the Structure complied with General Condition 9 and Regional Condition 7. (AR 75–78; AR 56–57). The Corps also asserts it was not required to conduct a site visit to evaluate how the culverts affected water flow. 33 C.F.R. § 325.2(d)(2)(iv).

The Court agrees with Plaintiffs. The authorization document and subsequent emails between Corps employees demonstrate that the Corps lacked highly relevant information, such as the bottom elevation of water at the structure (Doc. 21-2), when it determined that the structure would not impact water flow in violation of the two conditions. The Corps made its determination based on (1) a few photographs submitted by Miller taken during a few isolated moments in time (AR 75–78; 56–57), especially when the Corps itself determined that those photographs did not represent the lowest water level (Doc. 21-2); and (2) Miller's drawing of the Miller Structure that did not show the low water mark or the bottom elevation (AR 13). Accordingly, the Court finds that the Corps acted arbitrarily and capriciously in determining that the Miller Structure did not violate General Condition 9 and Regional Condition 7.

### 3. The Corps Unreasonably Concluded that the Structure Did Not Violate General Condition 5.

Next, Plaintiffs claim that the Miller Structure violated General Condition 5, which requires that "[n]o activity may occur in areas of concentrated shellfish populations[.]" (AR 20). In this case, the relevant shellfish are crawfish.

Plaintiffs contend that even though the Corps acknowledged that the structure would "permanently impact canal waterbottoms habitat and hydrology" (AR 1), and

26

that even though Louisiana Crawfish Producers Association-West informed the Corps that its members (*i.e.*, crawfishermen) "commercially fish" in "Pat's Throat Bayou and adjacent areas" (AR 87), the Corps failed to include any discussion of the Miller Structure's effect on crawfish populations in its authorization document. Plaintiffs also cited testimony from its crawfishermen members indicating that they fished in Pat's Throat Bayou and relied on it to access other nearby fishing spots (Doc. 30-3 ¶¶ 9, 12–14; Doc. 30-7 ¶ 3).

The Corps responds that the Declarants did not testify regarding the presence of crawfish within Pat's Throat itself. Instead, Declarants stipulated that Pat's Throat was an active fishing area, but necessarily not an active shellfish fishing area. (Doc. 30-3 ¶¶ 14–16). Therefore, the Corps concludes that there was nothing in the record or in extra-record evidence to support the contention that the Miller Structure was in an area containing concentrated shellfish populations.

The Court finds that the Corps arbitrarily and capriciously determined that the Miller Structure was not built in an area of concentrated shellfish populations. Specifically, the Corps had in the record before it notice from *crawfishermen* that they "commercially fished" in Pat's Throat Bayou as well as adjacent areas. (AR 87). The natural assumption that follows is that there were crawfish in Pat's Throat Bayou. Without discussing crawfish or explaining why it disagreed with Plaintiffs' statement, the Corps failed to consider an important aspect of the problem, or even inspect Pat's Throat to determine whether it was an area containing shellfish. The Court finds that the Corps did not have support for its determination that the Miller

27

Structure did not violate General Condition 5.

### 4. Conclusion.

In sum, the Corps failed to support its conclusion that the Miller Structure did not violate General Conditions 5 and 9 and Regional Condition 7. For this reason, the Corps' authorization of the Miller Structure under NWP 14 authorization #MVN-2021-01131-CF is invalid and vacated. However, at this time, the Court does not have enough information to determine whether the Miller Structure affirmatively violated the required general and regional conditions. Therefore, the Court will deny Plaintiffs' request to enjoin the application of NWP 14 generally and other nationwide permits to the Miller Structure.

### E. The Corps' Regulations Governing After-the-Fact Permits and Nationwide Permits Do Not Exceed the Corps' Statutory Authority Under RHA Section 10.

Plaintiffs turn from the issue of whether the Miller Structure met the requirements of NWP 14 to the issue of whether the Corps had authority at all under RHA Section 10 to issue regulations permitting after-the-fact permits and nationwide permits.

Section 10 of the RHA states:

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in

28

> any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and *authorized* by the Secretary of the Army *prior to beginning the same.*

33 U.S.C. § 403 (emphasis added).

Plaintiffs argue that an interpretation that weighs the structure, legislative history, and language of the text of Section 10 demonstrates that after-the-fact permits and general permits exceed the express authority delegated by Congress to the Corps in the RHA. The Court does not agree.

### 1. The Corps' Regulations Authorizing After-the-Fact Permits Do Not Exceed the Corps' Authority Under the RHA.

Plaintiffs first argue that Section 10 of the RHA prohibits the issuance of after-the-fact permits, such as the one that Miller received. Plaintiffs point to language in 33 U.S.C. § 403, above, that states that it is unlawful to construct a structure, such as the Miller Structure, unless the work was authorized by the Corps prior to construction. Therefore, Plaintiffs argue, the Corps' regulations allowing for the issuance of after-the-fact permits (33 C.F.R. § 326.3(e)) are not authorized by Congress. Plaintiffs further argue that the regulations undermine Congress's intent, because the RHA was "enacted to protect navigation and navigable capacity of the nation's waters" (42 Fed. Reg. 37122 (Jul. 19, 1977)), and after-the-fact permits allow for more instances of navigable obstruction.

The Corps responds that its authority to issue after-the-fact authorization is

inherent in RHA Section 12, 33 U.S.C. § 406, under which it has discretion to pursue the removal of unauthorized structures. That section states that "the removal of any structures or parts of structures erected in violation of" Section 10 "*may* be enforced by the injunction of [] district court[s.]" 33 U.S.C. § 406 (emphasis added). The statute states, moreover, that "proper proceedings to this end *may* be instituted under the direction of the Attorney General of the United States" *Id.* (emphasis added). The Corps claims this provides it with enforcement discretion. *See Opati v. Republic of Sudan*, 590 U.S. 418, 428 (2020) ("As we have repeatedly observed when discussing remedial provisions using similar language, the word 'may' clearly connotes discretion.") (internal quotations omitted).

The Court finds that the Corps' regulations do not exceed the Corps' authority under RHA Section 10. Section 10 describes what an individual building a structure in WOTUS is prohibited from doing (*e.g.*, the individual is prohibited from building the structure without obtaining prior authorization from the Corps). This is clear from the language of Section 10. 33 U.S.C. § 403 ("[I]t shall not be lawful *to build* . . ."). It is also clear from Section 12, under which violators "shall be deemed guilty of a misdemeanor" and punished through penalties and imprisonment if the Corps decides to pursue an enforcement action. 33 U.S.C § 406.

What Section 10 does not do is place prohibitions on how the Corps may respond to structures built without its prior authorization. Congress did not require that the Corps respond at all to these structures, instead stating that the Corps "may" respond by pursuing legal action. The Corps has issued regulations permitting it to

30

respond in ways that lie somewhere in between pursuing legal action, which it has discretion to do, and not responding at all, which it also has discretion to do. One of the methods within this range of options for response is the issuance of after-the-fact-permits if the Corps is satisfied that the project will adhere to applicable RHA and CWA requirements. In sum, the Corps did not exceed its authority under the RHA in issuing its after-the-fact regulations.

### 2. The Corps' Regulations Authorizing General Permits Do Not Exceed the Corps' Authority Under the RHA.

Plaintiffs next claim that RHA Section 10 contains no authority for the Corps to issue general permits for entire categories of activities. Section 10 makes it unlawful to excavate, fill, or alter navigable waters unless the work has been "authorized" by the Corps beforehand. 33 U.S.C. § 403. Plaintiffs contend that while the RHA grants the Corps to authority to authorize work via individual permits on a case-by-case basis, general permitting schemes exceed the Corps' authority to "authorize" work. Plaintiffs point out that while the CWA expressly authorizes the agency to create general permitting schemes (33 U.S.C § 1344(e)(1) ("[T]he Secretary may . . . issue general permits on a State, regional, or nationwide basis.")), the RHA contains no such express authorization. Plaintiffs also assert that the RHA's legislative history lacks reference to a general permitting scheme.

The Corps responds that the operative term RHA Section 10 is "authorize" (33 U.S.C. § 403 (Construction is prohibited "unless the work has been . . . authorized" by the Corps), and that "authorize" is broad enough to encompass not just individual permits, but also general permits. Moreover, with respect to the CWA's express

31

general permitting scheme, the Corps replies that the RHA was enacted decades before the CWA, and courts do not generally presume that Congress acts intentionally and purposely when it includes particular language in one statute, but not another, when the statutes are not contemporaneous. *Burnett v. Stewart Title, Inc.*, 431 B.R. 894, 897 (S.D. Tex. 2010), *aff'd sub nom. In re Burnett*, 635 F.3d 169 (5th Cir. 2011).

The Court agrees with the Corps. The Court does not find that the Corps exceeded its statutory authority by providing Section 10 RHA permits as NWP authorizations. By using language as broad as "authorize," Congress did not preclude the Corps from issuing general permits. *See also Vieux Carre Prop. Owners Residents and Ass'ns v. Brown,* 40 F.3d 112 (5th Cir. 1994) (treating nationwide permits as valid permits under the RHA).

In sum, Plaintiffs have failed to persuade the Court that the Corps' issuance of regulations authorizing after-the-fact permits and regulations allowing it to issue nationwide permits exceeds the statutory authority granted to it in the RHA.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 30) be and is hereby **GRANTED IN PART AND DENIED IN PART**. The Court finds that the Corps reached unsupported conclusions that the Miller Structure did not violate General Conditions 5 and 9 and Regional Condition 7.

**IT IS FURTHER ORDERED** that the Corps' authorization of the Miller Structure under authorization #MVN-2021-01131-CF is invalid and is **VACATED**.

**IT IS FURTHER ORDERED** that the Federal Defendants' Cross Motion for

Summary Judgment (Doc. 33) be and is hereby **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that the matter is **STAYED** and **ADMINISTRATIVELY CLOSED** to allow the Corps the opportunity to rectify the deficiencies and develop the record with respect to the Conditions aforementioned.

Baton Rouge, Louisiana, this 31ST day of March, 2026

_____
**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**